IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| ATINUM MIDCON I, LLC, | § | Case No. 16-33645 (MI) |
| | § | |
| Debtor. | § | |

**DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365 BANKRUPTCY RULES 2002, 6004, AND 6006 TO AUTHORIZE AND APPROVE THE (I) BIDDING PROCEDURES, (II) PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (III) NOTICES RELATING TO THE SALE OF THE DEBTOR'S ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS, (IV) APPROVAL OF THE PROPOSED SALE OF ASSETS AND SCHEDULING OF A HEARING ON APPROVAL OF THE PROPOSED SALE OF ASSETS, AND (V) GRANTING RELATED RELIEF**

---

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**THERE WILL BE A HEARING ON THIS MOTION ON AUGUST 17, 2016 AT 1:30 P.M. CENTRAL IN COURTROOM 404, 515 RUSK, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.**

---

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Atinum MidCon I, LLC, debtor-in-possession in the above-captioned case (the "Debtor")

files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Sale Procedures Order") authorizing and/or approving the (i) Bidding

Procedures (attached as **Exhibit 1** to the Sale Procedures Order)[1] for the Sale of the all the Debtor's assets (the "Assets"),[2] (ii) proposed date and time of the sale hearing (the "Sale Hearing"), (iii) form and manner of notice of respective dates, times, deadlines (including objection deadlines) and places in connection herewith, (iv) procedures for the assumption and assignment or rejection of designated executory contracts (the "Assumption and Rejection Procedures"), and (vi) granting related relief.

The Debtor further requests that, at the Sale Hearing, the Court enter an order (the "Sale Order"), which will be filed by the Debtor before the Sale Hearing, (i) authorizing the Sale of the all the Debtor's Assets free and clear of all claims, liens, encumbrances, and other interests pursuant to Section 363 of title 11 of the United States Code (the "Bankruptcy Code"), (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (iii) granting related relief.

## PRELIMINARY STATEMENT

1.      The Debtor filed this bankruptcy case to sell its assets pursuant to section 363 of the Bankruptcy Code.   The Debtor owns minority, non-operated, working interests in approximately 1600 oil and gas wells in Oklahoma and Kansas that are primarily operated by SandRidge Exploration and Production, LLC ("SandRidge").   The Debtor has defaulted on payment of over $365 million in secured bank debt, allegedly owes SandRidge approximately $42 for unpaid joint interest billings under a joint operating agreement, and cannot pay its management company to manage its assets.   After unsuccessful efforts to secure refinancing or

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Bidding Procedures attached as Exhibit 1 to the Sale Procedures Order.

[2] Attached as **Exhibit B** is a marketing presentation prepared by the Debtor's sales agent, PLS, Inc., that provides a more complete background of the Debtor's Oil and Gas Interests (defined below), which are the Debtor's primary Assets.

equity investment, the Debtor has negotiated an agreement with its Prepetition First Lien Lenders (defined below) to conduct a sale and auction process through this bankruptcy case.

2.     In order to effectuate the Sale, the Debtor has consulted its counsel, chief restructuring officer and financial advisor, sales agent (PLS, Inc.), and the Agent for the Prepetition First Lien Lenders (defined below) to develop the Bidding Procedures that are attached as **Exhibit 1** to the Sale Procedures Order.  The Sale contemplated by the Bidding Procedures is expected to maximize the value of the Assets for the Debtor's creditors.

## JURISDICTION, VENUE, AND PROCEDURAL BACKGROUND

3.     This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     On July 22, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy case (the "Case").

6.     Since the Petition Date, the Debtor has continued to operate and manage its business as a debtor in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

7.     The predicates for the relief requested herein are sections 105, 363, and 365 of the Bankruptcy Code and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

8.     As of the date hereof, an official committee of unsecured creditors has not been appointed in this Case.

## BACKGROUND

### A. Corporate History

9.      The Debtor was formed on July 28, 2011, for the purpose of acquiring non-operated working interests from SandRidge.  The Debtor's address and principal place of business is 333 Clay Street, Suite 700, Houston, Texas 77002.

10.      The Debtor's members are non-debtors (1) New Frontier Holdings 1, LLC ("Holdings 1"); (2) New Frontier Holdings 2, LLC ("Holdings 2"); (3) New Frontier Holdings 3, LLC ("Holdings 3"); and (4) New Frontier Holdings 4, LLC ("Holdings 4").  All four of the members are investment entities formed in the United States but ultimately owned and operated in South Korea by private equity funds managed by JB Asset Management Co., Ltd., a Korean asset management company.

### B. The Debtor's Principal Assets and Business Operations

11.      On August 3, 2011, the Debtor and SandRidge entered into an Asset Acquisition Agreement (the "AAA") for the Debtor's acquisition of an undivided 13.2% non-operated working interest in approximately 860,000 gross acres of oil and gas interests located in the Mississippian Lime formation found in northern Oklahoma and southern Kansas (the "Oil and Gas Interests").[3]  Below is a map illustrating the area in which SandRidge was operating within the Mississippian Lime formation around the time the Debtor acquired the Oil and Gas Interests (the "Sale"):[4]

---

[3] The acreage is located in Alfalfa, Garfield, Grant, Osage, Pawnee, Woodward, Harper, Payne, Woods, Noble, Major, and Kay, counties in Oklahoma, and Barber, Sumner, Comanche, Harper, Kiowa, Elk, and Cowley counties in Kansas.

[4] *See* Kevin R. White, Senior Vice President of Bus. Dev., SandRidge Energy, *SandRidge Investor Presentation*, p. 17 (Jun. 14, 2011).



In addition, the following is a map of what SandRidge indicated in its bankruptcy proceeding (discussed below) to be its "focus areas in the Missippian Lime formation:"[5]



---

[5] *See In re SandRidge Energy, Inc.*, Case No. 16-32488 (Bankr. S.D. Tex.) (ECF No. 22, p. 12)

12.     The Oil and Gas Interests constitute substantially all of the Debtor's assets.  In exchange for the Oil and Gas Interests, the Debtor paid $250 million in cash and committed to pay up to $250 million to carry 13.2% of SandRidge's development costs (the "Carry Obligation").[6]  The Carry Obligation has been satisfied by the Debtor and the mortgage granted in favor of SandRidge was released on February 14, 2014 for the Kansas properties and February 25, 2014 for the Oklahoma properties.

13.     Following the Sale, the Debtor and SandRidge entered into that certain Participation and Development Agreement ("Development Agreement"), dated as of September 28, 2011 and certain Joint Operating Agreements ("JOAs") pursuant to which the Debtor and SandRidge agreed to jointly participate in the exploration and development of certain oil and gas properties located within the "AMI Area" (which is the area jointly owned by the Debtor and SandRidge pursuant to the AAA, Development Agreement, and related documents).  Pursuant to these agreements (and subsequent agreements involving Repsol E&P USA, Inc. ("Repsol")), SandRidge serves as the operator with respect to the wells drilled within the AMI Area.

14.     On January 5, 2012, SandRidge sold a 16% working interests within the same AMI Area to Repsol for $272.5 million in cash and a drilling carry commitment of up to $750 million (this sale also included the sale of other working interests falling outside of the AMI Area).  Following this transaction, the Debtor, SandRidge, and Repsol agreed that they would operate in accordance with "Tri-Party JOAs" that bind all three entities for the development of the AMI Area.

---

[6] Debtor's carry obligations were secured by mortgages of Debtor's Oil and Gas Interests, and they were guaranteed by Atinum Partners Co., Ltd pursuant to that certain Guaranty Agreement dated September 28, 2011 in favor of SandRidge.

15.     The Debtor has fully funded its $250 million in carry obligations, making the final payment in the third quarter of 2013.  During this period and through today, the Debtor owns interests in approximately 1600 oil and gas wells in Oklahoma and Kansas.   Under the Development Agreement, applicable Tri-Party JOAs for each drilling unit, and Disposal System Participation Agreement dated September 28, 2011 ("Disposal Agreement"), the Debtor remains obligated to pay its 13.2% joint interest share of development and disposal costs.

16.     On May 16, 2016, SandRidge Energy, Inc. ("SandRidge Energy") and certain of its subsidiaries, including SandRidge, filed for chapter 11 bankruptcy in the Southern District of Texas.  In the SandRidge Energy bankruptcy proceeding, which is ongoing, SandRidge Energy intends to reduce $3.7 billion of its $4.1 billion of long term debt and continue operating its business during the pendency of and after emerging from bankruptcy.

## C.     The Debtor's Capital Structure[7]

17.     As of the Petition Date, the Debtor had long-term bank debt of approximately $365 million.

18.     On or about August 29, 2012, the Debtor entered into a First Lien Credit Agreement with certain lenders party thereto (the "Prepetition First Lien Lenders") and Wells Fargo Bank N.A., as Administrative Agent (The "First Lien Administrative Agent" or the "Agent") and as Issuing Lender (as amended, restated, modified, or supplemented, the "First Lien Credit Agreement") that provides for a four-year, $300 million term loan facility which matures on August 29, 2016.  The Debtor's repayment obligations are secured by mortgages and security interests in substantially all the Debtor's assets, including its Oil and Gas Interests. The

---

[7]  The Debtor reserves its rights concerning the claim amounts in the capital structure set forth herein.

Debtor used the proceeds from this loan primarily to fund its joint development obligations to SandRidge.

19.     As of the Petition Date, the Debtor had approximately $265 million outstanding under the Prepetition First Lien Credit Agreement inclusive of accrued and unpaid interest and make-whole amounts.

20.     On or about August 29, 2012, the Debtor also entered into a Second Lien Credit Agreement with a facility of up to $150 million among the Debtor, Wells Fargo Energy Capital, Inc., as administrative agent (the "Second Lien Administrative Agent"), and the lenders (the "Prepetition Second Lien Lenders," together with the "Prepetition First Lien Lenders," the "Lenders") party thereto (as amended, restated, modified or supplemented from time to time, the "Second Lien Credit Agreement," and, together with the First Lien Credit Agreement, the "Credit Agreements").   The Debtor's repayment obligations are secured by second-priority mortgages and security interests in substantially all of the Debtor's Oil and Gas Interests.

21.     As of the Petition Date, the Debtor had approximately $100 million outstanding under the Prepetition Second Lien Credit Agreement inclusive of accrued and unpaid interest and make-whole amounts.

22.     Also on August 29, 2012, the Debtor entered into an Intercreditor Agreement among the Debtor, Wells Fargo Bank, N.A., as First Lien Administrative Agent and Wells Fargo Energy Capital, Inc., as Second Lien Administrative Agent (as amended on March 20, 2013, the "Prepetition Intercreditor Agreement"), which governs the rights by and among the Prepetition First Lien Lenders and Prepetition Second Lien Lenders, including their respective rights in the event the Debtor files a bankruptcy proceeding.   Significantly, *inter alia*, pursuant to the Prepetition Intercreditor Agreement, the Prepetition Second Lien Lenders cannot (i) subject to

limited exceptions, enforce or exercise any rights or remedies with respect to any collateral for 180 days (the "Standstill Period") after delivering written notice of the acceleration of the Debtor's obligations to the First Lien Administrative Agent, (ii) contest the Debtor's use of cash collateral if the Prepetition First Lien Lenders have consented,[8] or (iii) "oppose or object to any Disposition of any Collateral free and clear of [their second priority liens] or other claims under Section 363 of the Bankruptcy Code . . . if the First Lien Secured Parties . . . shall consent to such Disposition . . ." *See* Prepetition Intercreditor Agreement Arts. §§ 3.02, 6.01.

23.     Due to the current oil and gas pricing environment, the value of the Debtor's Oil and Gas Interests has dropped significantly.  Accordingly, the Debtor believes that the claims under the Prepetition First Lien Credit Agreement are undersecured and the claims under the Prepetition Second Lien Credit Agreement are completely unsecured.

24.     With regard to equity interests, as noted above, the Debtor is owned by Holdings 1, Holdings 2, Holdings 3, and Holdings 4.  On September 28, 2011, Holdings 1 and Holdings 3 each made initial capital contributions to the Debtor in the amount of $38,364,000.  On or about November 24, 2011, Holdings 2 and 4 each made initial capital contributions to the Debtor in the amount of $100,636,000.

**D.     The Debtor's Management**

25.     The Debtor does not have any employees.  Instead, the Debtor is managed by Atinum Energy Investments, LLC ("AEI") pursuant to a Management Services Agreement dated effective as of January 1, 2012 (as amended, the "MSA").  Pursuant to the MSA, AEI provides a number of enumerated management services, including keeping books and records, joint interest

---

[8]  Accordingly, because the Prepetition First Lien Lenders have consented to and the Prepetition Second Lien Lenders are prohibited from contesting the use of cash collateral by the Prepetition Intercreditor Agreement, the Debtors' proposed use of cash collateral should be uncontested.

accounting functions, and obtaining and maintaining necessary permits and insurance, among other functions.

26.     Under the MSA, the Debtor is obligated to make quarterly payments of service charges (the "Service Charge") and reasonable expenses reimbursements to AEI.  The Service Charge is defined as .5% of all monies paid by the Debtor for defined Oil and Gas Exploration Activities.  The Debtor intended to use funds received from SandRidge to pay the Service Charge; however, the Debtor has failed to timely pay the Services Charges incurred in the last 12 months starting July 1, 2015, and the Debtor owes a total outstanding balance of $2,590,000.

**E.     Events Leading to the Debtor's Bankruptcy**

27.     The dramatic decline in oil and gas prices and sustained depressed state of the energy industry has put a significant strain on the Debtor's revenues and liquidity, thereby preventing the Debtor from servicing its debt, meeting its obligations to SandRidge, and paying the Service Charges owed to AEI.

28.     Oil and gas prices have plummeted and remained low over the last two years. The per-barrel price for Brent crude oil fell from more than $100 per barrel in September 2014 to less than $30 per barrel in January 2016.  Recently, the per-barrel price of crude oil has traded between $45 and $50 per barrel.

29.     Likewise, gas prices have declined dramatically during this time.  Natural gas prices were approximately $4.00 per million Btu in September 2014 and have fallen to approximately $2.00 per million BTU at the present time.  There remains great uncertainty in the oil and gas market with a number of industry experts predicting continued depressed prices throughout 2016.

30.     This decline in oil and gas prices has significantly impacted the Debtor's revenues.  The Debtor's revenue from oil and gas sales decreased $75,979,890 during 2015 to

$100,020,748, a 43.17% decrease compared to 2014.  With the precipitous drop in oil and gas prices significantly reducing the Debtor's revenues, the Debtor is no longer able to service its debt obligations and meet operational and management expenses.

31.     On October 7, 2015, the Debtor received a joint interest billing from SandRidge under the Tri-Party JOAs ("SandRidge November JIB") in the amount of $13,349,422.  This was much greater than the historical average of the prior JIBs and the Debtor was unable to pay the SandRidge November JIB costs.  According to SandRidge, as of June 30, 2016, the Debtor owes approximately $42 million.  Since January 31, 2016, SandRidge has been withholding all funds owed to the Debtor, which currently amounts to approximately $22,450,000.

32.     On March 21, 2016, the Prepetition First Lien Lenders gave notice of a Borrowing Base Deficiency (as defined in the First Lien Credit Agreement) in the amount of $165,000,000.  The notice further indicated that the Debtor would be required to pay the $165,000,000 in five consecutive monthly installments of $33,000,000 each.  On April 21, 2016, the Prepetition First Lien Lenders notified the Debtor that it was in default of its obligation to make the first $33,000,000 payment and demanded payment of this amount.  On May 6, 2016, based on the nonpayment of the first $33,000,000 payment, the Prepetition First Lien Lenders provided notice to the Debtor of the acceleration of and made demand for payment of the outstanding principal balance in the amount of $265,000,000, plus interest, costs, fees, and other payment obligations.

33.     On May 16, 2016, the First Lien Administrative Agent filed a Complaint for Money Judgment, Foreclosure, and the Appointment of Receiver in the United States District Court for the Western District of Oklahoma (the "District Court") against the Debtor (the "Receivership Action").  *See Wells Fargo Bank. N.A. v. Atinum MidCon I, LLC*, Case No. CIV-

16-512-C (W.D. Ok. 2016) (ECF No. 1).   In the Receivership Action, the First Lien Administrative Agent seeks (i) a money judgment in an amount not less than $265 million, plus prejudgment and post-judgment interest, based on breach of the First Lien Credit Agreement, (ii) to foreclose on the collateral securing the Debtor's payment obligations under the First Lien Credit Agreement, and (iii) to take possession of the First Lien Lenders' collateral.  *Id.*

34.     On June 21, 2016, the District Court "directed [the First Lien Administrative Agent] to proceed with its [Receivership Action] or to show cause for its inaction [since filing the return of service on May 26, 2016] not later than June 30, 2016."  *Id.* at ECF No. 7.  On June 30, 2016, the First Lien Administrative Agent filed a Response to Show Cause Order, which stated, among other things, that the Debtor "has indicated that it intends to file a Chapter 11 bankruptcy case," and that the Debtor and the First Lien Administrative Agent "have agreed on the identity and appointment of a chief restructuring officer to carry out that purpose." *Id.* at ECF No. 8.  The First Lien Administrative Agent further stated, however, that it did not want to dismiss the Receivership Action as of June 30, 2016 because it could not "control when, or if [AMC] actually files bankruptcy."  *Id.*

35.     On July 8, 2016, the Debtor filed a Reply to Response of Wells Fargo Bank to Show Cause Order stating, among other things, that the Debtor "is engaged in ongoing negotiations with the Plaintiff to facilitate a liquidation of the [Debtor's] assets and believes that in the interim, the [Receivership Action] . . . should not proceed."  *Id.* at ECF No. 11.  On July 14, 2016, the Debtor filed an Answer in the Receivership Action to negate the First Lien Administrative Agent's ability to seek a default judgment in the Receivership Action.  *Id.* at ECF No. 13.  On July 15, 2016, the First Lien Administrative Agent filed an Application for Hearing on Motion for Appointment of a Receiver, which requested a hearing on its Motion for

Appointment of Receiver at "the earliest convenient date." *Id.* at ECF No. 14. The Court granted this request and set a hearing on July 25, 2016.

36.     On March 9, 2016, the Prepetition Second Lien Lenders declared certain events of default under the Prepetition Second Lien Credit Agreement. On May 23, 2016, the Prepetition Second Lien Lenders declared an additional event of default and accelerated all the Debtor's payment obligations under the Prepetition Second Lien Credit Agreement.

37.     After the commencement of the Receivership Action, the Debtor and its Lenders began discussing and negotiating options for a potential restructuring of the Debtor's debts and/or bankruptcy filing. These discussions ultimately resulted in an agreement between the Debtor and the Lenders that the Debtor would file a Chapter 11 bankruptcy petition and sell substantially all of its assets pursuant to certain agreed Bidding Procedures. In connection with this proposed course of action, on or about June 20, 2016, the Debtor retained PLS, Inc. ("PLS"), subject to Bankruptcy Court approval, as its sales agent to begin organizing and packaging data relating to the Debtor's assets and to formulate and execute a plan for the solicitation of potential buyers and, ultimately, the Sale of the Assets.[9] PLS's marketing and sale efforts are ongoing.

38.     On July 22, 2016 the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code. The Debtor plans to sell all of its assets (namely, the Oil and Gas Interests) through this bankruptcy case.

## **RELIEF REQUESTED**

**A.     Introduction**

39.     By this Motion, the Debtor seeks entry of the Sale Procedures Order (attached as **Exhibit A**) approving and/or authorizing the (i) Bidding Procedures for the Sale of the Assets,

---

[9] PLS was retained after the Debtor formally interviewed three investment banks in addition to PLS.

(ii) proposed date and time of the Sale Hearing, (iii) form and manner of notice of respective dates, times, deadlines (including objection deadlines) and places in connection herewith, (iv) Assumption and Rejection Procedures, and (vi) granting related relief.

40.     In addition, the Debtor further requests that, at the Sale Hearing, the Court enter the Sale Order, which will be filed by the Debtor before the Sale Hearing, (i) authorizing the Sale of the Assets free and clear of all claims, liens, encumbrances, and other interests, (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (iii) granting related relief.

**B.     The Bidding Procedures and Sale Process**

41.     Following the receipt of the SandRidge November JIB, the Debtor's liquidity and cash flow has been severely constrained.  The Debtor has been unable to obtain prepetition or postpetition financing or equity investment to improve its liquidity position and, therefore, seeks to expeditiously sell its Assets in accordance with the Bidding Procedures and Section 363 of the Bankruptcy Code.  The Debtor's Board of Managers (the "Board") has authorized the Debtor to sell its assets under section 363 of the Bankruptcy Code.

42.     In order to complete the Sale, the Debtor retained PLS, Inc. ("PLS") as its sales agent for the Sale of the Assets.[10]  PLS specializes in providing divestment consulting services relating to oil and gas assets like the Assets at issue here.  These services include traditional property brokerage, prospect marketing, property valuation, and assistance with data aggregation, packaging & presentation, virtual data rooms, compiling potential buyer lists, offer

---

[10]  In early June 2016, prior to retaining PLS, the Debtor formally interviewed three investment banks and PLS (collectively, the "Potential Sales Agents") for the purpose of determining who to use and how best to market and sell the Debtor's Assets.  The interviews were followed by subsequent discussions with certain of the Potential Sales Agents, in which the participants continued to describe their services and potential strategies for selling the Assets.  Ultimately, the Debtor, in consultation with its advisors and the Agent, determined that PLS was best suited for acting as the sales agent for the Sale of the Debtor's Assets.

solicitation, negotiations, and transaction execution.  After its retention and in conjunction with the Debtor and its advisors, PLS began organizing and packaging the data relating to the Assets and soliciting potential purchasers of the Assets.  These efforts are ongoing and will continue up until the Bid Deadline (defined below).  Given that PLS was retained before the Petition Date and that the Bid Deadline is over seven weeks away, PLS has sufficient time to conduct a fulsome marketing and solicitation process to ensure that the maximum sale price for the Assets is obtained.

43.    The Debtor and the Agent agree that there are sufficient protections built into the Bidding Procedures to ensure that a meaningful and value-maximizing sale process occurs.  The material terms of the Bidding Procedures are as follows:[11]

a.    **Qualification as Bidder**:  To participate in the bidding process or the Auction, a person or entity interested in acquiring the Assets must first deliver the following materials to the Debtor and its advisors: (A) an executed confidentiality agreement in form and substance satisfactory to the Debtor and its advisors (the "Confidentiality Agreement"); and (B) written evidence that enables the Debtor and its advisors, in consultation with the Agent, to reasonably determine whether a Potential Bidder has the financial, operational, and other ability to close the proposed transaction for the Sale of the Assets (the "Proposed Transaction").

b.    **Due Diligence**:  Any Potential Bidder wishing to conduct due diligence concerning the Proposed Transaction shall be granted (i) reasonable access to the Debtor's management and/or PLS during normal business hours, and (ii) access to all relevant information regarding the business of the Debtor reasonably necessary to enable a Potential Bidder to evaluate the Proposed Transaction.

c.    **Bid Deadline**:  Any Potential Bidder interested in the Proposed Transaction must submit a Bid prior to **September 19, 2016 at 4:00 p.m. (Houston Time)** (the "Bid Deadline") via email to: (1) Atinum MidCon I, LLC, the Debtor, attn: Young Lee, E-mail: ylee@atinumenergy.com; (2) PLS, attn.: Ronyld W. Wise, E-mail: rwise@plsx.com; and (3) Andrews Kurth LLP, as counsel for the Debtor, attn. Timothy A. Davidson II, Esq., E-mail: taddavidson@andrewskurth.com;

---

[11] Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures as provided for in the Sale Procedures Order.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Bidding Procedures as provided for in the Sale Procedures Order, the actual terms and conditions of the Bidding Procedures as provided for in the Sale Procedures Order shall control.

<u>provided</u> that if the Debtor receives a Bid prior to the Bid Deadline that is not a Qualified Bid the Debtor may provide the Bidder with the opportunity to remedy any deficiencies prior to the Auction.

d.     **Bid Requirements**:  A Bid will be considered a "Qualified Bid" only if the Bid satisfies the following requirements prior to the Bid Deadline:

i.     Provides for the acquisition of the Assets pursuant to an executed purchase and sale agreement (a "<u>Purchase and Sale Agreement</u>") that contains terms no less favorable to the Debtor's estate than the Form PSA (as defined below), as determined by the Debtor, and that does not seek to extend the deadline for closing the Proposed Transaction beyond October 14, 2016;

ii.     Provides that the Bid shall remain irrevocable until the Sale Hearing, <u>provided</u>, that if such Bid is accepted as the Successful Bid or the Backup Bid (each, as defined below), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures;

iii.     Includes written evidence that the Qualified Bidder has demonstrated the necessary financial ability to close the Proposed Transaction and provided adequate assurance of future performance under all contracts to be assumed and assigned in such Proposed Transaction (if any);

iv.     Includes written evidence that such Qualified Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the execution of the agreements associated therewith, or a representation that no such authorization or approval is required;

v.     Provides that any cash portion of the purchase price will be paid in cash, cash equivalents, or such other consideration acceptable to the Debtor;

vi.     Be accompanied by, in an acceptable form of immediately available funds to be held by the Debtor, an earnest money cash deposit of not less than ten percent (10%) of the purchase price contained in the Bid (the "<u>Good Faith Deposit</u>");

vii.     Includes a proposed path and timeline reasonably satisfactory to the Debtor that exhibits the Qualified Bidder is reasonably likely to obtain prompt regulatory approval to consummate the Proposed Transaction;

viii.     Is submitted in the form of a legally binding Purchase and Sale Agreement, fully executed by the Qualified Bidder in a clean copy, together with redlined copy marked against the Form PSA, that further:

a)     Identifies the Qualified Bidder and any members of its investor group, if applicable, and provides full disclosure of any parent companies of the Qualified Bidder;

b)        Identifies with specificity the Assets being purchased, the liabilities being assumed (if any) and any contracts and leases the Qualified Bidder seeks to have assigned (if any);

c)        Identifies all conditions to the Qualified Bidder's obligation to consummate the Proposed Transaction;

d)        Is not subject to any conditions, representations, or terms that the Debtor determines to be unacceptable;

e)        Describes with specificity the total consideration proposed to be paid for the Assets;

f)        Is not conditioned upon the Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment;

g)        Is not conditioned upon tax, due diligence, financing or other contingency;

h)        Does not contain any condition to closing of the Proposed Transaction relating to the receipt of any third party approvals (excluding required Court approval);

i)        Expressly acknowledges and represents that the Qualified Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Proposed Transaction prior to making its Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents in making its Bid or that of any of its legal, financial or other advisors, (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtor or the Proposed Transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Purchase and Sale Agreement ultimately accepted and executed by the Debtor, and (D) accepts and consents to the Bidding Procedures and acknowledges the Court's exclusive jurisdiction to resolve issues related thereto;

j)        Provides that the Proposed Transaction will close on or before October 14, 2016; and

k)        Contains other information reasonably requested by the Debtor and its advisors.

e.  **No Auction**:  If only one Qualified Bid is received by the Debtor by the Bid Deadline, the Debtor shall not hold an Auction and such Qualified Bid shall be the Successful Bid.  If no Qualified Bid is received by the Debtor by the Bid Deadline, the Debtor shall not hold an Auction and shall not request approval of a sale of the Assets at the Sale Hearing.

f.  **Initial Highest Bid**:  Prior to the Auction, the Debtor, in consultation with the Agent, shall determine which Qualified Bid represents the then-highest or otherwise best bid (the "Initial Highest Bid" and the entity submitting such Bid, the "Initial Highest Bidder").  At least one business day prior to the Auction, each Qualified Bidder that timely submitted a Qualified Bid will be advised of such Initial Highest Bid and the Debtor shall distribute copies of such Initial Highest Bid to other Qualified Bidders.

g.  **Auction**:  If two or more Qualified Bids have been submitted for the Assets in accordance with the Bidding Procedures, the Debtor is authorized to conduct an Auction on **September 22, 2016 at 10:00 a.m. (Houston Time)** with respect to such Qualified Bids in order to determine the highest and best Bid (the "Successful Bid") to submit for approval by the Court.  The Auction shall be organized and conducted by the Debtor at the offices of Andrews Kurth LLP, 600 Travis, Suite 4200, Houston, Texas 77002, or such other location as may be announced prior to the Auction to the Auction Participants (defined below).

The Auction will be governed by the following procedures:

i.  Unless otherwise determined by the Debtor, the only persons or entities who will be permitted to Bid at the Auction are the authorized representatives for each Qualified Bidder[12] (the "Auction Participants"); provided, however, that the Debtor may, with the Agent's written consent, limit the number of Auction Participants at the Auction to the authorized representatives of the top three Qualified Bidders plus the Agent.  In addition, while only the Auction Participants may make Qualified Bids at the Auction, the Auction may also be attended by representatives of the Debtor, the U.S. Trustee, the Agent or any lender.

ii.  Each Qualified Bidder participating at the Auction will be required to represent that it has not engaged in any collusion with respect to the bidding or the Proposed Transaction.

iii.  The Auction shall be conducted by the Debtor in accordance with such procedures and requirements as may be established at the discretion of the Debtor and its advisors, after consultation with the Agent, to result in the highest and best offer for the Assets, which rules shall be announced prior to commencement of the Auction and may include the determination of

---

[12] Parties that have submitted bids for the Debtor's Assets, which were determined to be "Qualified Bids" by the Debtor, shall be deemed to be "Qualified Bidders" for purposes of these Bidding Procedures.

the amount of time between Qualified Bids, the conducting of multiple rounds of open bidding, and to declare that the Auction has ended when no further Bids are timely made or otherwise. The Debtor may waive and/or employ and announce at the Auction additional rules that are reasonable under the circumstances for conducting the Auction provided that such rules are (i) not inconsistent with the Sale Procedures Order, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules of the Court, or any order of the Court entered in connection with this Chapter 11 Case, and (ii) disclosed to each Auction Participant.

iv.     The first Qualified Bid at the Auction shall be deemed to have been made by the Initial Highest Bidder in the amount of the Initial Highest Bid. Thereafter, the Auction will continue in the manner determined by the Debtor as discussed above; provided, however, (i) additional Bids must be Qualified Bids (except that subsequent Qualified Bids made at the Auction, need not be received by the Bid Deadline), and (ii) additional Qualified Bids must be made in higher increments of at least $500,000 in cash (the "Minimum Bid Increment"). Each such additional Qualified Bid, shall be referred to herein as an "Overbid".

v.      The Debtor shall determine whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

vi.     The Auction shall continue until there is one Qualified Bid for the Assets that the Debtor, after consultation with the Agent, determines is the highest or best Qualified Bid at the Auction. At the conclusion of the Auction, the Debtor shall: (i) select the highest and best offer for the Assets (the "Successful Bid"); (ii) notify the person that made the Successful Bid (the "Successful Bidder") that such person's offer has been determined by the Debtor to be the Successful Bid, subject only to Court approval; and (iii) file a notice with the Court announcing the Successful Bidder and the Sale Hearing. The Sale Hearing shall be held on **September 27, 2016**, or such other date as the Court may set. Prior to the Sale Hearing, the Successful Bidder shall complete and sign all agreements and documents as necessary to bind the Successful Bidder to all of the terms and conditions contemplated by the Successful Bid.

vii.    The Good Faith Deposit of the Successful Bidder shall be applied by the Debtor against the purchase price to be paid by the Successful Bidder or held by the Debtor and forfeited, as the case may be, in accordance with the terms of the Purchase and Sale Agreement associated with the Successful Bid.

viii.   The Debtor shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Debtor's acceptance thereof have been authorized by order of the Court.

h.     **Good Faith Deposits**: The Good Faith Deposits of all Qualified Bidders shall be held in one or more accounts by the Debtor, but shall not become property of the Debtor's estate absent further order of the Court. The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder on the date that is the earlier of 72 hours after (a) the closing of the transaction with the Successful Bidder for the Assets bid upon by the Backup Bidder, and (b) the Outside Date (as defined below). If the Successful Bidder timely closes the winning transaction on or before October 14, 2016, its Good Faith Deposit shall be credited towards the purchase price.

i.     **Backup Bidder**: Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Debtor will be designated as the backup bidder (the "Backup Bidder"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final Overbid) (the "Backup Bid") open and irrevocable until the earlier of (i) 4:00 p.m. (Houston Time) on the date that is sixty (60) days after the date of entry of the Sale Order (the "Outside Date"), or (ii) the closing of the transaction with the Successful Bidder.

Following the Sale Hearing, if the Successful Bidder fails to consummate the Proposed Transaction, the Backup Bidder will be deemed to have the new prevailing bid, and the Debtor will be authorized, without further order of the Court, to consummate the transaction with the Backup Bidder. In such case of a breach or failure to perform on the part of such Successful Bidder, the defaulting Successful Bidder's deposit shall be forfeited to the Debtor. The Debtor reserves the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

j.     **Reservation of Rights**: The Debtor further reserves the right, as it may reasonably determine to be in the best interest of its estate and after consultation with the Agent, to: (1) determine which bidders are Qualified Bidders; (2) determine which Bids are Qualified Bids; (3) determine which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; (4) reject any Bid that is (A) inadequate or insufficient, (B) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (C) contrary to the best interests of the Debtor and its estate; (5) waive terms and conditions set forth herein with respect to all Potential Bidders; (6) impose additional terms and conditions with respect to all Potential Bidders; (7) extend the deadlines set forth herein; (8) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (9) modify the Bidding Procedures and implement additional procedural rules that the Debtor determines, in its business judgment, will better promote the goals of the bidding process and

discharge the Debtor's fiduciary duties and are not inconsistent with any Court order.

k.  **<u>Credit Bid Rights:</u>** The Agent shall have the right to make a credit bid and to participate in the Auction as a Qualified Bidder and Auction Participant.  Nothing in the Bidding Procedures is intended to, or shall, impair or limit the Agent's credit bid rights pursuant to 11 U.S.C. § 363(k) or otherwise.

## C.  The Form of the Purchase and Sale Agreement

44.  Although there is no stalking horse bidder, the Debtor has prepared a form Purchase and Sale Agreement ("Form PSA"), a copy of which will be filed in the near future and provided to prospective purchasers, pursuant to which a purchaser would acquire the Assets. The Debtor has determined that distributing the Form PSA to interested parties provides the best available platform for conducting the Sale and Auction.  However, as set forth in the Bidding Procedures, a Qualified Bid may alter the terms of the Form PSA, provided that the changes do not materially impact the economic value of the Proposed Transaction.

## D.  The Sale Notice

45.  Within three business days following entry of the Sale Procedures Order, the Debtor will provide notice, substantially in the form attached as **Exhibit 2** to the Sale Procedures Order (the "Sale Notice"), of the Sale Procedures Order, Bidding Procedures, the Auction, the Sale Hearing, and the Objection Deadline (defined below).

46.  In accordance with the United States Bankruptcy Court for the Southern District of Texas's Procedures for Complex Chapter 11 Bankruptcy Cases (the "Complex Case Procedures"), *see* Complex Case Procedures Ex. C sec. 2 (p. 17), the Debtor proposes to serve the Sale Notice via electronic notice and/or first class United States mail on: (i) all entities contacted by PLS, Inc. or reasonably believed by the Debtor to have expressed an interest in the Proposed Transaction with respect to the Assets during the past six (6) months prior to the entry of the Sale Procedures Order; (ii) all parties to executory contracts and unexpired leases

proposed to be assumed and assigned, or rejected as part of the proposed transaction, if any; (iii) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Assets; (iv) the parties that have filed proofs of claim in the Debtor's case at the addresses set forth in the respective proofs of claim, (v) the parties who have filed a written request for notice in the Debtor's case pursuant to Bankruptcy Rule 2002, (vi) the office of the United States Trustee, (vii) the agents for prepetition lenders, and (viii) all parties set forth in the Debtor's Master Service List (to the extent any party to receive notice thereby has not received notice pursuant to sections (i) through (vii) above) (collectively, the "Sale Notice Parties").

47.     The Debtor asserts that service of such Sale Notice as proposed herein is sufficient notice of the entry of the Sale Procedures Order, the Bidding Procedures, the Auction, the Sale Hearing, and the Proposed Transaction, including, without limitation, the sale of the Assets, and the procedure for objecting thereto (including the September 26, 2016 objection deadline, the "Objection Deadline," set forth therein), and no other or further notice is necessary.

48.     The Debtor further notes that, as soon as possible after the conclusion of the Auction, the Debtor shall file a notice identifying the Successful Bidder and Backup Bidder.

**E.     The Assignment and Rejection Notice**

49.     In accordance with Bankruptcy Rule 2002, the Debtor must provide notice of the (i) potential assumption and assignment of executory contracts and unexpired leases and rights thereunder, (ii) the maximum amount that the Debtor may pay to cure all defaults, if any, and to pay all losses that have resulted from defaults, under executory contracts and unexpired leases that the Debtor proposes to assume and assign (the "Cure Amounts"), and (iii) the deadline for Contract Counterparties (defined below) to file objections to such assumption and assignment,

maximum Cure Amounts, the existence of any defaults, and/or adequate assurance of the future performance. Accordingly, the Debtor requests the approval of the following Assumption and Rejection Procedures for notifying counterparties to executory contracts and unexpired leases of potential Cure Amounts with respect to those executory contracts and unexpired leases that the Debtor proposes to assume and assign to the Successful Bidder (the "Transferred Contracts").

50.     Upon entry of the Sale Procedures Order, the Debtor (i) will file a notice of potential assumption, assignment and/or transfer of the executory contracts and unexpired leases listed therein (such list, the "Transferred  Contract and Cure Schedule")[13] and (ii) serve such notice on all non-debtor parties to the Transferred Contracts (the "Contract Counterparties"). The Assignment and Rejection Notice shall list the Cure Amounts, if any, that the Debtor believes must be paid to cure all defaults outstanding under each Transferred Contract.

51.     The Debtor proposes to serve the Assignment and Rejection Notice by (a) first class United States mail, postage prepaid on (i) all counterparties to executory contracts and unexpired leases that may be assumed by the Debtor pursuant to Bankruptcy Code § 365 and that the Successful Bidder or other purchaser of the Assets desires (or may desire) to be assigned by the Debtor; and (ii) on those parties receiving electronic notice through the Court's electronic filing system. The Debtor asserts that service of such Assignment and Rejection Notice as proposed is sufficient notice of, among other things, the proposed assumption and assignment of the Transferred Contracts, the Cure Amounts, the procedures for objecting thereto, the Sale Hearing, and that no other or further notice is necessary.

---

[13] The "Transferred  Contract and Cure Schedule" shall be substantially in the form attached as **Exhibit A** to the Notice of Proposed (I) Assumption and Assignment of Designated Executory Contracts and (II) Rejection of Contracts (the "Assignment and Rejection Notice"), which is attached as **Exhibit 3** to the Sale Procedures Order.

52.     In addition, if the Successful Bidder identifies additional executory contracts or unexpired leases that it wishes to add to the Transferred Contracts and Cure Schedule (each an "Additional Contract") (or wishes to remove a Transferred Contract from the Transferred Contracts and Cure Schedule), the Debtor shall, within two calendar days thereafter, send a supplemental Assignment and Rejection Notice to the applicable counterparties to such executory contracts or unexpired leases added or removed from the Transferred Contracts and Cure Schedule.  To the extent an executory contract or lease is not assumed and assigned through the Sale, the Debtor will reject such unassigned executory contract or unexpired lease.

53.     The Debtor requests that the Court require that any objections to the assumption and assignment of the Transferred Contracts (each, an "Assignment Objection") must: (i) be made in writing and filed on the docket no later than **September 8, 2016 at 4:00 p.m. (Houston Time)** (the "Assignment Objection Deadline"), (ii) state the basis of such objection with specificity as further explained in the following section of this Motion, (iii) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and (iv) be served on the parties set forth in the Bidding Procedures.

54.     The Assignment and Rejection Notice shall also provide that Assignment Objections, if any, will be heard at a hearing to be held prior to the Bid Deadline or at such other date prior to or after the Sale Hearing, as the Court may designate. Any supplemental Assignment and Rejection Notice relating to an Additional Contract shall provide that Additional Assignment Objections will be heard by the Court on or before five (5) calendar days from the timely filing of the Additional Assignment Objection (or such other date designated by the Court).

55.     At the Sale Hearing, the Debtor and/or the purchaser of the Assets shall (i) present evidence necessary to demonstrate adequate assurance of future performance by the purchaser, and (ii) request entry of an order approving the assumption and assignment of any or all Transferred Contracts to be assumed and assigned to the purchaser of the Assets.   For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

**F.      Objections and Preferential Rights**

56.     The Debtor further requests that the following objection requirements and related procedures (substantially in the form below) be implemented with respect to the Sale Notice and Assignment Notice discussed herein:

a.    Any person or entity failing to timely file an objection to the Proposed Transaction shall be forever barred from doing so, including from objecting to the transfer of the Debtor's right, title and interest in, to and under the Debtor's Assets free and clear of any and all liens, encumbrances, claims and other interests, and will be deemed to consent to the Proposed Transaction.

b.    If any person or entity asserts that any property or right (including a Transferred Contract) cannot be transferred, sold, assumed, and/or assigned free and clear of all liens, encumbrances, claims and other interests except as otherwise set forth in the applicable purchase and sale agreement on account of one or more alleged approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights (a "Preferential Rights"), then such person or entity must file and serve a notice with the Court with all supporting documentation (a "Rights Notice") on or before the Bid Deadline.   Each Rights Notice must identify the properties or rights that are subject to such alleged right, identify the type of right(s) claimed by such party, identify the agreement, document, or statute giving rise to such right, and identify the portion of the agreement, document, or statute giving rise to such right.

c.    Any person or entity failing to timely file and serve a Rights Notice will be (a) forever barred from objecting to the transfer, sale, assumption, and/or assignment of the Debtor's Assets, including, from asserting any alleged Preferential Rights with respect to the Debtor's transfer, sale, assumption, and/or assignment of the Debtor's Assets, and (b) deemed to consent to and approve the transfer, sale, assumption, and/or assignment of the Debtor's Assets free and clear of all liens, encumbrances, claims and other interests.

      d.  If any person or entity timely files and serves a Rights Notice, the Debtor will have the opportunity to object to any alleged Preferential Rights asserted by filing an objection to such Rights Notice at any time prior to the Sale Hearing.  Upon the filing of such objection to the Rights Notice, any rights asserted are deemed to be disputed and the Debtor is entitled to assert a bona fide dispute exists as to such rights asserted.

57.     The Debtor respectfully requests that this Court approve the foregoing notice and objection procedures.

## G.     Sale of Assets Free and Clear of Interests

58.     The Debtor has determined in its sound business judgment that the Proposed Transaction is in the best interest of its estate and creditors.   Therefore, the Debtor hereby requests that this Court approve the Sale of the Debtor's Assets to the Successful Bidder (or Backup Bidder, as the case may be) free and clear of all Claims and Interests.

## H.     Good Faith Sale

59.     The Debtor submits that any Successful Bidder will have participated in a good faith manner in the Auction in accordance with the Bid Procedures, which require that, among other things, the Auction be recorded by an authorized court reporter, the Auction Participants must represent that they have not engaged in any collusion, and that Bidding be conducted openly.  Therefore, the Debtor will present evidence at the Sale Hearing in support of its request that this Court find that the Successful Bidder is a good faith purchaser entitled to the full protections afforded pursuant to § 363(m) of the Bankruptcy Code.

## I.     Request to Schedule Sale Hearing

60.     The Debtor requests that this Court set the Sale Hearing on or about September 29, 2016. At the Sale Hearing, the Debtor intends to seek entry of a Sale Order (i) approving the Sale, free and clear of all Claims and Interests, and (ii) authorizing the assumption and

assignment of the Transferred Contracts.  For purposes of full disclosure, in the Sale Order, the Debtor will seek to sell its Assets free and clear of all liens, interests, claims and encumbrances to the fullest extent possible pursuant to Bankruptcy Code section 363(f), including without limitation, successor liability or similar theories (except for those assumed liabilities and obligations, expressly assumed pursuant to the applicable purchase and sale agreement) and the Successful Bidder will be protected from liability for and cannot be pursued for any claims owed by the Debtor.  In addition, the Sale Order will have findings that the Sale is not a fraudulent conveyance.  It is expected that the applicable purchase and sale agreement will contain these, and other standard provisions, as conditions to the Sale.

**J.      Assumption and Assignment of Executory Contracts and Unexpired Leases**

61.      Pursuant to § 365 of the Bankruptcy Code (and as more fully discussed below) the Debtor requests this Court's approval of the assumption and assignment of executory contracts and unexpired leases to the successful purchaser as designated in any applicable purchase agreement.

**K.      Waiver of 14-Day Stay**

62.      Because time is of the essence in regard to the transactions contemplated herein, the Debtor requests that this Court waive the 14-day stay provided in Bankruptcy Rules 6004(a) and 6006(d) for the orders requested herein.

<u>**ARGUMENTS AND AUTHORITIES**</u>

**A.      The Bidding Procedures are Reasonable, Appropriate, and Will Maximize Value**

63.      A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business. 11 U.S.C. § 363.  As a general matter, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the tendered purchase price is the highest and best offer under the circumstances of the case.  *See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re*

*Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

64. The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts in this district as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.[14] The Debtor submits that the foregoing Bidding Procedures and the opportunity for competitive bidding embodied therein are reasonable and designed to maximize the value of the Debtor's estate and should, therefore, be approved by this Court.

65. Given the Debtor's liquidity position, lack of postpetition financing, the inability to pay its JIBs under the Tri-Party JOAs, and the pendency of the Receivership Action, the Debtor believes that a prompt sale process is the best way to maximize the value of its assets for the benefit of its estate, creditors and other stakeholders. To this end, the Debtor has developed the Bidding Procedures, which will give the Debtor an opportunity to consider competing bids and select the highest and best offer for its Assets. The Debtor submits that the Bidding

---

[14] *See, e.g., In re Sherwin Alumina Co., LLC*, Case No. 16-20012 [Docket No. 433] (Bankr. S.D. Tex. 2016) (Order approving bidding procedures for a potential sale under section 363.); *In re BPZ Resources, Inc.*, Case No. 15-60016 [Docket No. 239] (Bankr. S.D. Tex. 2015) (Order authorizing the sale of substantially all of the debtor's assets free and clear.); *In re ASR-8 Centre LP*, Case No. 14-30174 [Docket No. 110] (Bankr. S.D. Tex. 2014) (Order authorizing debtor to sell real property free and clear.); *In re Buccaneer Resources LLC*, Case No. 14-60041 [Docket No. 489] (Bankr. S.D. Tex. 2014) (Order authorizing the sale of substantially all of the debtors' assets free and clear.); *In re TMT Procurement Corp.*, Case No. 13-33763 [Docket Nos. 1932, 1936, 1338, 1940, 1944, 1945, 1946, 1947, 1948, 1949] (Bankr. S.D. Tex. 2014) (Orders authorizing the sale of numerous vessels under Bankruptcy Code section 363 free and clear.); *In re ATP Oil & Gas Corp.*, Case No. 12-36187 [Docket Nos. 2279, 2666, 2706, 2866, 3278] (Bankr. S.D. Tex. 2013-2014) (Orders authorizing the sale of certain of the debtors' assets free and clear.).

Procedures and Auction should promote active bidding from seriously interested parties, which will increase the likelihood that the Debtor will receive the best possible consideration for the Assets.  Additionally, the Bidding Procedures will allow the Debtor to conduct an Auction in a fair and open fashion that will encourage participation by financially capable bidders that have the ability to close on the Sale.  This process is designed to generate a higher sale price than would otherwise be obtained through a chapter 7 liquidation or foreclosure under applicable state law, which are apparently the Debtor's only other alternatives to the relief it seeks in this Case.

66.     Accordingly, in the exercise of its reasonable business judgment, the Debtor has concluded that: (a) a prompt sale of the Assets is the best way to maximize value for its estate, and (b) the proposed Bidding Procedures described herein are the most effective method of obtaining the highest and best offer for those Assets.

**B.     Approval of the Sale Free and Clear is in the Best Interest of the Debtor's Estate**

67.     Pursuant to Bankruptcy Code § 105(a), a bankruptcy court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." *See* 11 U.S.C. § 105(a).  Bankruptcy Code § 363(b)(1) provides, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  The proposed use, sale or lease of property of the estate may be approved under Bankruptcy Code § 363(b) if it is supported by sufficient business justification.  *See e.g. Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Resources Corp.*,

72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park Partnership*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).  And in reviewing a proposed sale of assets, a bankruptcy court should give deference to the business judgment of a debtor in possession when it deems the sale to be appropriate. *See Esposito v. Title Ins. Co. (In re Fernwood Mkts)*, 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987).

68.     The Debtor has determined in the exercise of its business judgment that consummation of the Proposed Transaction is in the best interest of the Debtor's estate and creditors. After evaluating various alternatives, the Debtors have concluded that the Proposed Transaction will maximize the value of its estate and will be in the best interests of its creditors. The Debtor believes that the Bidding Procedures will result in a purchase price that is reasonable under the circumstances, including the present depressed state of the oil and gas industry and the fact that the operator of the Assets (SandRidge) is also in chapter 11 bankruptcy.

69.     Pursuant to Bankruptcy Code § 363(f), a debtor may sell property free and clear of all claims, encumbrances, liens, and other interests if (i) applicable nonbankruptcy law permits the sale of such property free and clear of such interest; (ii) the lienholder or claimholder consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) the lienholder or claimholder could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  *See* 11 U.S.C. § 363(f). These five conditions are written in the disjunctive, permitting the sale of estate assets upon the satisfaction of any one of the five conditions, including consent of the lienholders.  *See Pelican Homestead v. Wooten (In*

*re Gabel)* 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (stating that a trustee may sell property of the estate for purposes other than in the ordinary course of business free and clear of all existing liens and encumbrances provided that any one of the conditions of § 363(f) are met); *In re Taxi Holders, Inc.*, 307 B.R. 525, 528-29 (Bankr. E.D. Va. 2004) (same).

70.     Furthermore, it is well established that a bankruptcy court has the power, pursuant to § 363(f) of the Bankruptcy Code, to approve the sale of a debtor's assets free and clear of any claims against the debtor. *In re TWA, Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of § 363); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same).

71.     At the Sale Hearing, the Debtor will demonstrate that at least one of the five conditions of Bankruptcy Code § 363(f) is satisfied with respect to any other interest asserted by any other party in the Assets to be sold.   Having exercised sound business judgment in determining to sell its Assets to the Successful Bidder free and clear of all claims (other than expressly assumed obligations), encumbrances, liens, and interests, as set forth in the applicable purchase and sale agreement, the Debtor hereby requests that such a Sale be approved.

## C.     The Proposed Sale Notice is Reasonable Under the Circumstances

72.     Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify creditors of the Sale, including a disclosure of the time and place of any auction, the terms and conditions of the sale, and the deadline for filing any objections.   The Debtor submits that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale, Bidding Procedures, Auction, and Sale Hearing to the Debtor's creditors and all other parties in interest that are entitled to notice,

as well as those parties that have expressed a bona fide interest in acquiring the Debtor's Assets. In addition the Sale Notice, the Debtor shall file a notice with the Court announcing the Successful Bid and the Sale Hearing promptly after the conclusion of the Action in accordance with the Bidding Procedures.

73.     Accordingly, the Debtor respectfully requests the Court to approve the notice procedures set forth in this Motion, including the form and manner of service of the Sale Notice, and that no other or further notice of the Sale, Bidding Procedures, Auction or Sale Hearing is necessary or required.

**D.      Assumption and Assignment of Executory Contracts and Unexpired Leases**

74.     Pursuant to Bankruptcy Code § 365, the Debtor requests authority to assume the Transferred Contracts pursuant to the Assumption and Rejection Procedures (discussed above) and to assign the Debtors' right, title and interest in, to and under those contracts and leases and rights thereunder to the Successful Bidder, subject to, and at the time of, the closing of the Potential Transaction.

75.     Bankruptcy Code § 365(a) authorizes a trustee to "assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Although Bankruptcy Code § 365 does not set forth standards for courts to apply in determining whether to approve a debtor's decision to assume an executory contract or unexpired lease, it is well-established that the decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the debtor.  *See In re Taylor*, 913 F.2d 102, 107 (3rd Cir. 1990); *Sharon Steel Corn. v. Nat'l Fuel Gas Distrib. Corn.*, 872 F.2d 36, 39 (3rd Cir. 1989); *In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  Accordingly, assumption or rejection of any executory contract is appropriate where the assumption or rejection would benefit the estate.

*Sharon Steel*, 872 F.2d at 40; *see also In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D.N.Y. 1986). Any more exacting scrutiny would potentially slow the administration of a debtor's estate, increase costs, and interfere with the Bankruptcy Code's provision for private control of administration of the estate.  *See Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

76.    Furthermore, pursuant to Bankruptcy Code § 365(b)(1), a debtor must cure, or provide adequate assurance that it will promptly cure, certain defaults prior to the assumption and/or assignment of executory contracts or unexpired leases.  And Bankruptcy Code § 365(f)(2) provides that a trustee may assign an executory contract or unexpired lease of the debtor only if "(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease."  11 U.S.C. § 365(f)(2).

77.    Here, the Successful Bidder may desire to acquire the benefit of certain of the Debtor's executory contracts and unexpired leases and have the rights thereunder determined prior to the closing of the Potential Transaction.  In order to accommodate any such desire, the Debtor agrees to satisfy any requirements regarding cure, including the payment of Cure Amounts owed to third parties, that may be imposed under Bankruptcy Code § 365(b) or applicable state law in connection with the proposed assumption and assignment of any Transferred Contracts.

78.    On the closing date of the Sale, or as soon thereafter as practicable, the Debtor will pay from the proceeds of the Sale of the Assets to each of the counterparties to the

Transferred Contracts assumed and assigned as part of such Sale for which there is not a dispute as to Cure Amounts, the Cure Amounts related to the Transferred Contracts.

79.     The Successful Bidder shall be responsible for providing evidence of "adequate assurance of future performance" to the extent required in connection with the assumption and assignment of any Transferred Contracts. The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to Bankruptcy Code § 365 depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrar (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that the debtor will thrive or pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If necessary, the Successful Bidder will demonstrate that it has the financial ability to perform under the Transferred Contracts at the Sale Hearing (or such other date as the Court may set).

80.     Accordingly, the Debtor respectfully submits that the procedures proposed herein for Transferred Contracts being assumed and assigned at the closing of the Potential Transaction are appropriate and reasonably tailored to provide non-debtor counterparties to such Transferred Contracts with adequate notice in the form of the Assignment and Rejection Notice of the proposed assumption and assignment of the applicable Transferred Contract, as well as proposed Cure Amounts, if applicable.  The Debtor further submits that, based on the foregoing (and any evidence or argument made at the Sale Hearing to the extent objections arise), the Debtor should be permitted to assume and assign its Transferred Contracts.

###### L.      Relief Under Bankruptcy Rule 6004(h) and 6006(d) is Appropriate

81.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise."   The Debtor requests that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

82.      The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.   *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).   Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, courts have waived the 14-day stay period where there has been no objection to the procedure, or any objection has been overruled.   Moreover, courts have approved a waiver of the 14-day stay where the delay in effectuating the order would harm the estate.   *See, e.g., In re Nature Leisure Times, LLC*, No. 06–41357, 2007 WL 4554276 at *3 (Bankr. E.D. Tex. Dec. 19, 2007) (eliminating the waiting period under Rule 6004(h) because exigent circumstances existed); *In re Perry Hollow Mgmt. Co.*, Inc., 297 F.3d 34, 41 (1st Cir. 2002) (affirming bankruptcy court's waiver of the stay where the sale price was reasonable, the buyer was ready to complete the sale the next day and there would be storage charges for the assets if there were a delay).   The Debtor submits that cause exists to justify a waiver of the 14-day stay under Bankruptcy Rule 6004(h), as promptly closing the Sale is of critical importance to the Debtor's

estate. The Debtor requests that the Sale Order be effective immediately by providing that the 14-day stays be waived.

## NOTICE

The Debtor shall serve a copy of this Motion by first class mail upon the Sale Notice Parties and the parties listed on the Debtor's Creditor Matrix.  In light of the nature of the relief requested, the Debtor submits that no further notice is required or needed under the circumstances.

## PRAYER

The Debtors respectfully request that this Court enter the Sale Procedures Order attached as **Exhibit A** and thereby authorize and approve the (i) Bidding Procedures for the Sale of the Assets, (ii) proposed date and time of the Sale Hearing, (iii) form and manner of notice of respective dates, times, deadlines (including objection deadlines), and places in connection with the Sale and the assumption and assignment of the Debtor's executory contracts and unexpired leases, (iv) Assumption and Rejection Procedures, and (v) grant any related relief.

The Debtor further requests that, at the Sale Hearing, the Court enter the Sale Order, which will be filed by the Debtor before the Sale Hearing, (i) authorizing the Sale of the all the Debtor's Assets free and clear of all claims, liens, encumbrances, and other interests pursuant to Section 363 of title 11 of the United States Code, (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (iii) granting related relief.

Dated: July 22, 2016                    Respectfully submitted,

                                        ANDREWS KURTH LLP

                                        By:    /s/ Timothy A. ("Tad") Davidson II
                                               Timothy A. ("Tad") Davidson II
                                               Texas Bar No. 24012503
                                               David A. Zdunkewicz
                                               Texas Bar No. 22253400
                                               Joseph W. Buoni
                                               Texas Bar No. 24072009
                                               600 Travis, Suite 4200
                                               Houston, Texas 77002
                                               Telephone: (713) 220-4200
                                               Facsimile:  (713) 220-4285
                                               taddavidson@andrewskurth.com
                                               dzdunkewicz@andrewskurth.com
                                               josephbuoni@andrewskurth.com

                                        *Proposed Counsel for the*
                                        *Debtor and Debtor in Possession*