IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ATINUM MIDCON I, LLC, | § | Case No. 16-33645(MI) |
| | § | |
| Debtor. | § | |

**DEBTOR'S MOTION FOR ENTRY OF ORDER (I) AUTHORIZING
USE OF CASH COLLATERAL, (II) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
AND (III) GRANTING ADEQUATE PROTECTION**

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **THERE WILL BE A HEARING ON THIS MOTION ON AUGUST 17, 2016 AT 1:30 P.M. CENTRAL IN COURTROOM 404, 515 RUSK, HOUSTON, TEXAS 77002.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Atinum MidCon I, LLC, debtor-in-possession in the above-captioned case (the "Debtor") files this motion (the "Motion") for entry of an order: (i) authorizing use of cash collateral, (ii) granting liens and providing superpriority administrative expense status; and (iii) granting adequate protection, and respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Debtor filed this bankruptcy case to sell its assets pursuant to section 363 of the Bankruptcy Code. After good-faith, arm's-length negotiations, the Agent for the Prepetition First Lien Lenders (defined below) supports the use of cash collateral as set forth in this Motion. The Debtor is not seeking an expedited interim hearing or interim approval to use cash collateral because the Debtor does not expect to make any cash expenditures between the Petition Date and the August 17, 2016 hearing date set by the Bankruptcy Court. This provides full notice of the relief requested herein.

2. The Debtor has approximately $850,000 in cash as of the Petition Date and may receive additional cash receipts during the case all of which constitutes the collateral of the Prepetition First Lien Lenders (the "Cash Collateral"). The Debtor will use the Cash Collateral to fund the Debtor's operations and expenses that will be incurred in marketing and the selling the Debtor's assets (the "Assets"). In the event the Debtor is not authorized to use the Cash Collateral, the Debtor believes it will be unable to preserve and enhance the value of its Assets as it pursues the sale. The Debtor's use of cash collateral shall be made in accordance with the budget attached as **Exhibit A** (the "Budget"). The Debtor requests approval for the use of Cash Collateral under 11 U.S.C. § 363(c)(2).

**JURISDICTION AND VENUE**

3. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

HOU:3698017.6

5. On July 22, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

6. Since the Petition Date, the Debtor continues to operate its businesses and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. The statutory basis for the relief requested herein is found in sections 105, 361, 362, and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

8. As of the date of this Motion, the United States Trustee has not yet appointed any official committees in these cases, and no request has been made for the appointment of a trustee or examiner.

## BACKGROUND

### A. Corporate History

9. The Debtor was formed on July 28, 2011, for the purpose of acquiring non-operated working interests from SandRidge. The Debtor's address and principal place of business is 333 Clay Street, Suite 700, Houston, Texas 77002.

10. The Debtor's members are non-debtors (1) New Frontier Holdings 1, LLC ("Holdings 1"); (2) New Frontier Holdings 2, LLC ("Holdings 2"); (3) New Frontier Holdings 3, LLC ("Holdings 3"); and (4) New Frontier Holdings 4, LLC ("Holdings 4"). All four of the members are investment entities formed in the United States but ultimately owned and operated in South Korea by private equity funds managed by JB Asset Management Co., Ltd., a Korean asset management company.

B.   **The Debtor's Principal Assets and Business Operations**

11.   On August 3, 2011, the Debtor and SandRidge entered into an Asset Acquisition Agreement (the "AAA") for the Debtor's acquisition of an undivided 13.2% non-operated working interest in approximately 860,000 gross acres of oil and gas interests located in the Mississippian Lime formation found in northern Oklahoma and southern Kansas (the "Oil and Gas Interests").[1] Below is a map illustrating the area in which SandRidge was operating within the Mississippian Lime formation around the time the Debtor acquired the Oil and Gas Interests (the "Sale"):[2]



---

[1] The acreage is located in Alfalfa, Garfield, Grant, Osage, Pawnee, Woodward, Harper, Payne, Woods, Noble, Major, and Kay, counties in Oklahoma, and Barber, Sumner, Comanche, Harper, Kiowa, Elk, and Cowley counties in Kansas.

[2] *See* Kevin R. White, Senior Vice President of Bus. Dev., SandRidge Energy, *SandRidge Investor Presentation*, p. 17 (Jun. 14, 2011).

4

In addition, the following is a map of what SandRidge indicated in its bankruptcy proceeding (discussed below) to be its "focus areas in the Missippian Lime formation:"[3]



12.     The Oil and Gas Interests constitute substantially all of the Debtor's assets.  In exchange for the Oil and Gas Interests, the Debtor paid $250 million in cash and committed to pay up to $250 million to carry 13.2% of SandRidge's development costs (the "Carry Obligation").[4]  The Carry Obligation has been satisfied by the Debtor and the mortgage granted in favor of SandRidge was released on February 14, 2014 for the Kansas properties and February 25, 2014 for the Oklahoma properties.

13.     Following the Sale, the Debtor and SandRidge entered into that certain Participation and Development Agreement ("Development Agreement"), dated as of September 28, 2011 and certain Joint Operating Agreements ("JOAs") pursuant to which the Debtor and

---

[3] *See In re SandRidge Energy, Inc.*, Case No. 16-32488 (Bankr. S.D. Tex.) (ECF No. 22, p. 12)

[4] Debtor's carry obligations were secured by mortgages of Debtor's Oil and Gas Interests, and they were guaranteed by Atinum Partners Co., Ltd pursuant to that certain Guaranty Agreement dated September 28, 2011 in favor of SandRidge.

SandRidge agreed to jointly participate in the exploration and development of certain oil and gas properties located within the "AMI Area" (which is the area jointly owned by the Debtor and SandRidge pursuant to the AAA, Development Agreement, and related documents).  Pursuant to these agreements (and subsequent agreements involving Repsol E&P USA, Inc. ("Repsol")), SandRidge serves as the operator with respect to the wells drilled within the AMI Area.

14.     On January 5, 2012, SandRidge sold a 16% working interests within the same AMI Area to Repsol for $272.5 million in cash and a drilling carry commitment of up to $750 million (this sale also included the sale of other working interests falling outside of the AMI Area).  Following this transaction, the Debtor, SandRidge, and Repsol agreed that they would operate in accordance with "Tri-Party JOAs" that bind all three entities for the development of the AMI Area.

15.     The Debtor has fully funded its $250 million in carry obligations, making the final payment in the third quarter of 2013.  During this period and through today, the Debtor owns interests in approximately 1600 oil and gas wells in Oklahoma and Kansas.  Under the Development Agreement, applicable Tri-Party JOAs for each drilling unit, and Disposal System Participation Agreement dated September 28, 2011 ("Disposal Agreement"), the Debtor remains obligated to pay its 13.2% joint interest share of development and disposal costs.

16.     On May 16, 2016, SandRidge Energy, Inc. ("SandRidge Energy") and certain of its subsidiaries, including SandRidge, filed for chapter 11 bankruptcy in the Southern District of Texas.  In the SandRidge Energy bankruptcy proceeding, which is ongoing, SandRidge Energy intends to reduce $3.7 billion of its $4.1 billion of long term debt and continue operating its business during the pendency of and after emerging from bankruptcy.

C. **The Debtor's Capital Structure**[5]

17. As of the Petition Date, the Debtor had long-term bank debt of approximately $365 million.

18. On or about August 29, 2012, the Debtor entered into a First Lien Credit Agreement with certain lenders party thereto (the "Prepetition First Lien Lenders") and Wells Fargo Bank N.A., as Administrative Agent (The "First Lien Administrative Agent" or the "Agent") and as Issuing Lender (as amended, restated, modified, or supplemented, the "First Lien Credit Agreement") that provides for a four-year, $300 million term loan facility which matures on August 29, 2016. The Debtor's repayment obligations are secured by mortgages and security interests in substantially all the Debtor's assets, including its Oil and Gas Interests. The Debtor used the proceeds from this loan primarily to fund its joint development obligations to SandRidge.

19. As of the Petition Date, the Debtor had approximately $265 million outstanding under the Prepetition First Lien Credit Agreement inclusive of accrued and unpaid interest and make-whole amounts.

20. On or about August 29, 2012, the Debtor also entered into a Second Lien Credit Agreement with a facility of up to $150 million among the Debtor, Wells Fargo Energy Capital, Inc., as administrative agent (the "Second Lien Administrative Agent"), and the lenders (the "Prepetition Second Lien Lenders," together with the "Prepetition First Lien Lenders," the "Lenders") party thereto (as amended, restated, modified or supplemented from time to time, the "Second Lien Credit Agreement," and, together with the First Lien Credit Agreement, the

---

[5] The Debtor reserves its rights concerning the claim amounts in the capital structure set forth herein.

"Credit Agreements"). The Debtor's repayment obligations are secured by second-priority mortgages and security interests in substantially all of the Debtor's Oil and Gas Interests.

21. As of the Petition Date, the Debtor had approximately $100 million outstanding under the Prepetition Second Lien Credit Agreement inclusive of accrued and unpaid interest and make-whole amounts.

22. Also on August 29, 2012, the Debtor entered into an Intercreditor Agreement among the Debtor, Wells Fargo Bank, N.A., as First Lien Administrative Agent and Wells Fargo Energy Capital, Inc., as Second Lien Administrative Agent (as amended on March 20, 2013, the "Prepetition Intercreditor Agreement"), which governs the rights by and among the Prepetition First Lien Lenders and Prepetition Second Lien Lenders, including their respective rights in the event the Debtor files a bankruptcy proceeding. Significantly, *inter alia*, pursuant to the Prepetition Intercreditor Agreement, the Prepetition Second Lien Lenders cannot (i) subject to limited exceptions, enforce or exercise any rights or remedies with respect to any collateral for 180 days (the "Standstill Period") after delivering written notice of the acceleration of the Debtor's obligations to the First Lien Administrative Agent, (ii) contest the Debtor's use of cash collateral if the Prepetition First Lien Lenders have consented,[6] or (iii) "oppose or object to any Disposition of any Collateral free and clear of [their second priority liens] or other claims under Section 363 of the Bankruptcy Code . . . if the First Lien Secured Parties . . . shall consent to such Disposition . . ." *See* Prepetition Intercreditor Agreement Arts. §§ 3.02, 6.01.

23. Due to the current oil and gas pricing environment, the value of the Debtor's Oil and Gas Interests has dropped significantly. Accordingly, the Debtor believes that the claims

---

[6] Accordingly, because the Prepetition First Lien Lenders have consented to and the Prepetition Second Lien Lenders are prohibited from contesting the use of cash collateral by the Prepetition Intercreditor Agreement, the Debtors' proposed use of cash collateral should be uncontested.

8

under the Prepetition First Lien Credit Agreement are undersecured and the claims under the Prepetition Second Lien Credit Agreement are completely unsecured.

24. With regard to equity interests, as noted above, the Debtor is owned by Holdings 1, Holdings 2, Holdings 3, and Holdings 4. On September 28, 2011, Holdings 1 and Holdings 3 each made initial capital contributions to the Debtor in the amount of $38,364,000. On or about November 24, 2011, Holdings 2 and 4 each made initial capital contributions to the Debtor in the amount of $100,636,000.

### D. The Debtor's Management

25. The Debtor does not have any employees. Instead, the Debtor is managed by Atinum Energy Investments, LLC ("AEI") pursuant to a Management Services Agreement dated effective as of January 1, 2012 (as amended, the "MSA"). Pursuant to the MSA, AEI provides a number of enumerated management services, including keeping books and records, joint interest accounting functions, and obtaining and maintaining necessary permits and insurance, among other functions.

26. Under the MSA, the Debtor is obligated to make quarterly payments of service charges (the "Service Charge") and reasonable expenses reimbursements to AEI. The Service Charge is defined as .5% of all monies paid by the Debtor for defined Oil and Gas Exploration Activities. The Debtor intended to use funds received from SandRidge to pay the Service Charge; however, the Debtor has failed to timely pay the Services Charges incurred in the last 12 months starting July 1, 2015, and the Debtor owes a total outstanding balance of $2,590,000.

### E. Events Leading to the Debtor's Bankruptcy

27. The dramatic decline in oil and gas prices and sustained depressed state of the energy industry has put a significant strain on the Debtor's revenues and liquidity, thereby

preventing the Debtor from servicing its debt, meeting its obligations to SandRidge, and paying the Service Charges owed to AEI.

28. Oil and gas prices have plummeted and remained low over the last two years. The per-barrel price for Brent crude oil fell from more than $100 per barrel in September 2014 to less than $30 per barrel in January 2016. Recently, the per-barrel price of crude oil has traded between $45 and $50 per barrel.

29. Likewise, gas prices have declined dramatically during this time. Natural gas prices were approximately $4.00 per million Btu in September 2014 and have fallen to approximately $2.00 per million BTU at the present time. There remains great uncertainty in the oil and gas market with a number of industry experts predicting continued depressed prices throughout 2016.

30. This decline in oil and gas prices has significantly impacted the Debtor's revenues. The Debtor's revenue from oil and gas sales decreased $75,979,890 during 2015 to $100,020,748, a 43.17% decrease compared to 2014. With the precipitous drop in oil and gas prices significantly reducing the Debtor's revenues, the Debtor is no longer able to service its debt obligations and meet operational and management expenses.

31. On October 7, 2015, the Debtor received a joint interest billing from SandRidge under the Tri-Party JOAs ("SandRidge November JIB") in the amount of $13,349,422. This was much greater than the historical average of the prior JIBs and the Debtor was unable to pay the SandRidge November JIB costs. According to SandRidge, as of June 30, 2016, the Debtor owes approximately $42 million. Since January 31, 2016, SandRidge has been withholding all funds owed to the Debtor, which currently amounts to approximately $22,450,000.

32. On March 21, 2016, the Prepetition First Lien Lenders gave notice of a Borrowing Base Deficiency (as defined in the First Lien Credit Agreement) in the amount of $165,000,000. The notice further indicated that the Debtor would be required to pay the $165,000,000 in five consecutive monthly installments of $33,000,000 each. On April 21, 2016, the Prepetition First Lien Lenders notified the Debtor that it was in default of its obligation to make the first $33,000,000 payment and demanded payment of this amount. On May 6, 2016, based on the nonpayment of the first $33,000,000 payment, the Prepetition First Lien Lenders provided notice to the Debtor of the acceleration of and made demand for payment of the outstanding principal balance in the amount of $265,000,000, plus interest, costs, fees, and other payment obligations.

33. On May 16, 2016, the First Lien Administrative Agent filed a Complaint for Money Judgment, Foreclosure, and the Appointment of Receiver in the United States District Court for the Western District of Oklahoma (the "District Court") against the Debtor (the "Receivership Action"). *See Wells Fargo Bank. N.A. v. Atinum MidCon I, LLC*, Case No. CIV-16-512-C (W.D. Ok. 2016) (ECF No. 1). In the Receivership Action, the First Lien Administrative Agent seeks (i) a money judgment in an amount not less than $265 million, plus prejudgment and post-judgment interest, based on breach of the First Lien Credit Agreement, (ii) to foreclose on the collateral securing the Debtor's payment obligations under the First Lien Credit Agreement, and (iii) to take possession of the First Lien Lenders' collateral. *Id.*

34. On June 21, 2016, the District Court "directed [the First Lien Administrative Agent] to proceed with its [Receivership Action] or to show cause for its inaction [since filing the return of service on May 26, 2016] not later than June 30, 2016." *Id.* at ECF No. 7. On June 30, 2016, the First Lien Administrative Agent filed a Response to Show Cause Order, which

stated, among other things, that the Debtor "has indicated that it intends to file a Chapter 11 bankruptcy case," and that the Debtor and the First Lien Administrative Agent "have agreed on the identity and appointment of a chief restructuring officer to carry out that purpose." *Id.* at ECF No. 8. The First Lien Administrative Agent further stated, however, that it did not want to dismiss the Receivership Action as of June 30, 2016 because it could not "control when, or if [AMC] actually files bankruptcy." *Id.*

35.   On July 8, 2016, the Debtor filed a Reply to Response of Wells Fargo Bank to Show Cause Order stating, among other things, that the Debtor "is engaged in ongoing negotiations with the Plaintiff to facilitate a liquidation of the [Debtor's] assets and believes that in the interim, the [Receivership Action] . . . should not proceed." *Id.* at ECF No. 11. On July 14, 2016, the Debtor filed an Answer in the Receivership Action to negate the First Lien Administrative Agent's ability to seek a default judgment in the Receivership Action. *Id.* at ECF No. 13. On July 15, 2016, the First Lien Administrative Agent filed an Application for Hearing on Motion for Appointment of a Receiver, which requested a hearing on its Motion for Appointment of Receiver at "the earliest convenient date." *Id.* at ECF No. 14. The Court granted this request and set a hearing on July 25, 2016.

36.   On March 9, 2016, the Prepetition Second Lien Lenders declared certain events of default under the Prepetition Second Lien Credit Agreement. On May 23, 2016, the Prepetition Second Lien Lenders declared an additional event of default and accelerated all the Debtor's payment obligations under the Prepetition Second Lien Credit Agreement.

37.   After the commencement of the Receivership Action, the Debtor and its Lenders began discussing and negotiating options for a potential restructuring of the Debtor's debts and/or bankruptcy filing. These discussions ultimately resulted in an agreement between the

Debtor and the Lenders that the Debtor would file a Chapter 11 bankruptcy petition and sell substantially all of its assets pursuant to certain agreed Bidding Procedures. In connection with this proposed course of action, on or about June 20, 2016, the Debtor retained PLS, Inc. ("<u>PLS</u>"), subject to Bankruptcy Court approval, as its sales agent to begin organizing and packaging data relating to the Debtor's assets and to formulate and execute a plan for the solicitation of potential buyers and, ultimately, the Sale of the Assets.[7] PLS's marketing and sale efforts are ongoing.

38.  On July 22, 2016 the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code. The Debtor plans to sell all of its assets (namely, the Oil and Gas Interests) through this bankruptcy case.

## RELIEF REQUESTED

39.  Pursuant to 11 U.S.C. § 363(c)(2), the Debtor respectfully requests that the Court authorize and approve the Debtor's use of Cash Collateral in accordance with the Budget and pursuant to the terms of the proposed Cash Collateral Order attached hereto as **Exhibit B**.

40.  The Debtor further requests that, in accordance with the proposed Cash Collateral Order, it be authorized to provide adequate protection to the Prepetition First Lien Lenders on the terms set forth below and in the proposed Cash Collateral Order.

## SUMMARY OF KEY PROVISIONS

41.  The Debtor seeks to use the Prepetition First Lien Lenders' Cash Collateral in accordance with the Budget. In order to do so with the consent of the Agent for the Prepetition First Lien Lenders, the Debtor seeks authority to grant the following adequate protection:

---

[7] PLS was retained after the Debtor formally interviewed three investment banks in addition to PLS.

| Provision | Description |
|---|---|
| **Adequate Protection for Prepetition First Lien Lenders** | As adequate protection for any diminution in the value of their collateral from and after the Petition Date, the Prepetition First Lien Lenders and Prepetition First Lien Agent under the Prepetition First Lien Credit Agreement shall:<br><br>(i) receive reimbursement on a monthly basis of the reasonable professional fees, expenses, and disbursements incurred the Prepetition First Lien Agent; and<br><br>(ii) receive solely to the extent of any diminution in the value of the Prepetition First Lien Lenders' and Prepetition First Lien Agent's collateral from and after the Petition Date:<br><br>• First Priority on Unencumbered Property. Pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), a valid, binding, continuing, enforceable, fully-perfected, non-voidable first priority lien and/or replacement lien on, and security interest in, all of the Debtor's rights in tangible and intangible assets, including without limitation, all prepetition and post-petition assets of the Debtor's estate, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to (x) valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date or (y) valid and unavoidable liens in existence for amounts outstanding as of the Petition Date that are perfected after the Petition Date as permitted by Bankruptcy Code section 546(b) (collectively, the "Unencumbered Property"), including without limitation, the Debtor's interest in oil and gas properties (and as-extracted collateral, goods, fixtures and hydrocarbons relating thereto), wells, accounts receivable, other rights to payment, any right to receive any residual of any retainer provided to any Professionals (as defined below) after payment of such Professional's allowed fees and expenses, cash, inventory, general intangibles, contracts, servicing rights, swap and hedge proceeds and termination payments, servicing receivables, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, claims and causes of action (including those arising under Bankruptcy Code section 549), commercial tort claims, and the proceeds of all of the foregoing, provided that the Unencumbered Property shall not include the avoidance actions under chapter 5 of the Bankruptcy Code (with the exception of actions arising under Section 549 which are included herein);<br><br>• Liens Junior to Certain Existing Liens. Pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), a valid, binding, continuing, enforceable, fully-perfected non-voidable junior priority replacement lien on, and security interest in, all of Debtor's tangible and intangible assets, including without limitation, all prepetition and post-petition property of the Debtor's estates, and all products and |

14

| | |
|---|---|
| | proceeds thereof, whether now existing or hereafter acquired (other than the property described in the Cash Collateral Order, that is subject to (x) valid, perfected and unavoidable liens in existence as of the Petition Date or (y) valid and unavoidable liens in existence for amounts outstanding as of the Petition Date that are perfected after the Petition Date as permitted by Bankruptcy Code section 546(b), which valid, perfected and unavoidable liens are senior in priority to the security interests and liens in favor of the Administrative Agent (the "Other Senior Liens");<br><br>• Liens Senior to Certain Existing Liens. Pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), a valid, binding, continuing, enforceable, fully-perfected non-voidable priming lien on, and security interest in, all tangible and intangible assets, including without limitation, all prepetition and post-petition property of the Debtor's estates, and all products and proceeds thereof, whether now existing or hereafter acquired; provided that such liens and security interests shall not prime the Other Senior Liens; and<br><br>• Sections 503 and 507(b) Claim.  The Adequate Protection Obligations due to the Administrative Agent and the Lenders shall constitute administrative expense claims against the Debtor as provided in Bankruptcy Code section 503(b) and superpriority claims as provided in Bankruptcy Code section 507(b) with priority in payment over any and all unsecured claims and administrative expense claims against the Debtor, now existing or hereafter arising, of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114, and shall at all times be senior to the rights of any creditor, in the Chapter 11 Case or any subsequent proceedings, including without limitation any Chapter 7 proceeding, under the Bankruptcy Code, subject and subordinate only to the Carve Out. |
| **Carve-Out** | For purposes herein, "Carve-Out" shall mean:<br><br>• All statutory fees required to be paid by the Debtor to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code (irrespective of whether the Carve Out Notice has been delivered;<br><br>• All accrued and unpaid fees, disbursements, costs, and expenses (the "Professional Fees") incurred by professionals or professional firms retained by the Debtor or its estate pursuant to Bankruptcy Code sections 327, 328, or 363 and any statutory committee (the "Committee") appointed in the Chapter 11 Case pursuant to Bankruptcy Code section 1103 (collectively, the "Professionals") at any time before or on the first business day following delivery by the Administrative Agent to counsel to the Debtor, the U.S. Trustee, and counsel to any Committee of a written notice (the "Carve Out Notice"), which notice may be delivered at any time following the |

15

HOU:3698017.6

|  | occurrence of the Termination Date or a Termination Event (as defined in the Cash Collateral Order) to the extent (x) set forth in the Budget, and (y) allowed or approved by the Court before or after the delivery of the Carve Out Notice, including on an interim basis; |
|---|---|
|  | • All unpaid allowed administrative expenses incurred before or on the first business day following delivery by the Administrative Agent of the Carve Out Notice in accordance with the Cash Collateral Order to the extent (x) set forth in the Budget, (y) allowed or approved by the Court before or after the delivery of the Carve Out Notice, and (z) in all other respects subject to the Budget; and |
|  | • The Professional Fees allowed by this Court in an aggregate amount not exceeding $50,000 (plus any unused retainers held by Debtor's Professionals), which are incurred after the first business day following delivery by the Administrative Agent of the Carve Out Notice. |

42. Additionally, attached hereto as **Exhibit C** is the Attorney Checklist Concerning Motion and Orders Pertaining to Use of Cash Collateral and DIP Financing.

## BASIS FOR RELIEF

### A. The Debtor Should Be Authorized to Use the Cash Collateral

43. Section 363(c)(2) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral, providing in pertinent part as follows:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

44. Further, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

45. The Debtor has satisfied the requirements of subsections (c)(2) and (e) of section 363 of the Bankruptcy Code and should be authorized to use its Cash Collateral. The Agent for the Prepetition First Lien Lenders has agreed to the use of the Cash Collateral. Accordingly, the Court should authorize the Debtor to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

46. To account for any diminution in value, the Debtor will provide adequate protection to the Prepetition First Lien Lenders which shall include: (i) replacement liens and a superpriority administrative expense under sections 503 and 507 of the Bankruptcy Code solely to the extent of any diminution in value of the Prepetition First Lien Lenders' collateral; and (ii) monthly payment of the fees and expenses of the professionals of the Agent for the Prepetition First Lien Lenders.

47. As to the Prepetition Second Lien Lenders, the Debtor believes that the Prepetition First Lien Lenders are undersecured, rendering the claims of the Prepetition Second Lien Lenders and any other purported secured creditors fully unsecured. As such, adequate protection does not need to be provided to the Prepetition Second Lien Lenders because their claims are unsecured.[8]

### B. The Scope of the Carve-Out is Appropriate.

48. The adequate protection granted for the use of the Cash Collateral is subject to the Carve-Out. Such carve-outs for administrative expenses, professional fees and U.S. Trustee's fees have been found to be reasonable and necessary to ensure that a debtor's estate (and any

---

[8] In addition, the Prepetition Intercreditor Agreement governs the rights by and among the Prepetition First Lien Lenders and Prepetition Second Lien Lenders, including their respective rights in the event of a bankruptcy. Pursuant to the Prepetition Intercreditor Agreement, the Prepetition Second Lien Lenders cannot contest the Debtor's use of cash collateral if the Prepetition First Lien Lenders have consented. Accordingly, because the Prepetition First Lien Lenders have consented to and the Prepetition Second Lien Lenders are prohibited from contesting the use of cash collateral by the Prepetition Intercreditor Agreement, the Debtor believes its proposed use of cash collateral is uncontested.

statutory committee) can obtain appropriate assistance from counsel and other professionals.[9] In addition to covering professional fees, the Carve-Out also includes amounts for all unpaid allowed administrative expenses incurred consistent with the Budget. The Carve-Out is in a reasonable amount and ensures that assets remain for the payment of U.S. Trustee fees, professional fees of the Debtor, and other unpaid-budgeted administrative expense claims notwithstanding the grant of superpriority and administrative liens and claims and adequate protection liens and claims.

## WAIVER OF STAY

49.     The Debtor seeks a waiver of any stay of the effectiveness of the Cash Collateral Order. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above the continued use of cash collateral is essential to prevent irreparable damage to the Debtor's operations, value and ability to effectuate a sale. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## NOTICE

50.     Notice of this Motion has been given to the parties on the Debtor's proposed Master Service List, which includes (a) the Office of the United States Trustee for the Southern District of Texas; (b) the Prepetition First Lien Lenders and their counsel; (c) the Agent; (d) the Prepetition Second Lien Lenders and their counsel; (e) the agent under the Prepetition Second Lien Credit Agreement; (f) the unsecured non-insider creditors of the Debtor listed on Form 204

---

[9] *See In re Ames Dep't Stores, Inc.*, 114 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").

filed at ECF No. 1, (g) counsel for any official committee of unsecured creditors that may be appointed, (h) the Internal Revenue Service, and (i) any persons who have filed a request for notice pursuant to Bankruptcy Rule 2002. The Debtor submits that no further notice need be given and that the notice provided by the Debtor is sufficient.

## **CONCLUSION**

The Debtor respectfully requests that the Court (i) set a hearing on this Motion, and (ii) enter an order granting the relief requested herein.

[*Remainder of Page Left Blank Intentionally*]

Dated: July 22, 2016

Respectfully submitted,

ANDREWS KURTH LLP

By: /s/ Timothy A. ("Tad") Davidson II
Timothy A. ("Tad") Davidson II
Texas Bar No. 24012503
David A. Zdunkewicz
Texas Bar No. 22253400
Joseph W. Buoni
Texas Bar No. 24072009
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile: (713) 220-4285
taddavidson@andrewskurth.com
dzdunkewicz@andrewskurth.com
josephbuoni@andrewskurth.com

*Proposed Counsel for the
Debtor and Debtor in Possession*